# M. K. & T. RAILWAY CO. v. CITY OF FORT SCOTT.

1. JUDGE PRO TEM.; *Powers and Jurisdiction; Settling Case.* Under § 1, chapter 85 of the laws of 1870, a judge *pro tem.* may, after the expiration of the term at which a case has been tried before him, if within the time allowed by law, or the order of the court, settle and sign a case made.

2. TIME FOR SETTLING CASE; *Suggesting Amendments; Section 548 of Code, Construed.* The statute allows three days after the time fixed for making and serving a case, for the suggestion of amendments; and an extension of time for making and serving a case does not take away the three days for the suggestion of amendments, and such latter time commences to run, not from the date of the actual service of the case made, but from the expiration of the period of extension.

3. ———— Where by the order of the court thirty days are given in which to make and serve a case, it is settled and signed in time, if settled and signed within thirty-three days from the date of the order.

4. CERTIFICATE OF TRIAL JUDGE; *When it May or Ought to be Disregarded.* Where the certificate of the trial judge to a case made, or bill of exceptions, is shown to be intentionally false, and to have been fraudulently prepared, this court may disregard it; but it should be wholly disregarded. If the falsehood and corruption be in favor of the plaintiff in error, and to secure a reversal, ordinarily the rights of the defendant in error can be protected in a new trial. If in

favor of the defendant in error and to prevent a reversal, cases may arise in which it will be the duty of this court to set aside the judgment and order a new trial, upon the presumption, on account of such corruption in the preparation of the case made, or bill of exceptions, that the plaintiff in error was wronged upon the trial.

5. ————— *Not to be Altered, or Reformed.* But not even in such a case, will this court attempt to reform the certificate by striking out, or adding thereto. So that, where a motion has been made in this court to strike out a portion of the certificate of the trial judge to a case made, on the ground that it was intentionally false, and fraudulently prepared, and the charge is made that there was a conspiracy between the said judge and the counsel of defendant in error to prevent the plaintiff in error from obtaining a case for review, such motion must be overruled without regard to the questions of fact raised thereby.

6. CONTRACT BETWEEN CITY AND RAILWAY COMPANY; *Municipal Aid; Conditions; Breach; Measure of Damages.* The city of Fort Scott subscribed $75,000 of stock in the Missouri, Kansas & Texas railway company, and issued $75,000 of its bonds in payment therefor. It also, by virtue of the said contract, issued to the said company $25,000 of its bonds for the purchase of the right of way through the city and grounds for machine-shops, engine-houses, etc. The subscription was made upon condition that the company should construct, within six months, a railroad from Sedalia, Missouri, through Fort Scott, to connect with the line running from Junction City in a southeasterly direction; that it should make this the great through-line to the Indian Territory and Texas, and construct no other line of road south of Fort Scott in the same direction, and that it should make Fort Scott the end of a division, and erect engine-houses and machine-shops at or near said place before doing so at any other point southwest of Sedalia on the through line of its road. The company complied with this contract, except that it did not make Fort Scott the end of a division, and did not erect the engine-house and machine-shops there, but did so erect them at Parsons. In an action by the city against the company for damages, for failing to comply with this part of its contract, testimony was admitted for the purpose of proving the damages sustained, over the objection of the company, tending to show a decline in the population of Fort Scott, and a depreciation generally in the value of real estate through the city during a period commencing subsequently to the construction of the road, yet prior to the building of the shops and engine-houses at. Parsons, and ending after the fact of such building had become known at Fort Scott: *Held,* That such testimony was improperly admitted, and that such matters did not enter into or form a part of the proper measure of damages.

7. ——— *Speculative Damages not Allowable.* Such testimony is objectionable because it is speculative, and because amid the variety of causes tending to produce such results there is no means of determining how much is due to this single cause: it is also tantamount to inquiry into profits and those not the direct and immediate fruits of the contract, but remote and uncertain; and it does not disclose the direct pecuniary loss of the city, which in an action *ex contractu* is the proper measure of damages.

8. ——— *Rules for Measuring Damages.* The following may be laid down as true rules for ascertaining the damages in cases like this: Wherever it can be shown by the contract, or *aliunde*, that a certain and definite amount was paid as a consideration for the condition broken, such sum and interest may be properly recovered. Or, where the unperformed condition is the erection of buildings, or other improvements, within the city, the value of such improvements for purpose of taxation, may be treated as the measure of damages.

9. ——— *Where Contract is Entire.* Where the contract is an entirety, and there is in it no means of apportionment, and nothing can be shown *aliunde* to establish an apportionment, nor to show the relative or absolute values of the several conditions, no action can be maintained to recover the consideration, if unpaid, nor upon a *quantum meruit*, until all the conditions are performed; and if the consideration has been paid in advance, and only part of the conditions are performed, the entire consideration can be recovered back. Yet to this conclusion, in any given case, the law reluctantly comes, and only when it is perfectly clear that, by no construction or evidence can there be any apportionment or determination of values.

*Error from Bourbon District Court.*

THE *City of Fort Scott* brought its action to recover from the *Missouri, Kansas & Texas Railway Company*, the sum of one hundred thousand dollars, for alleged breach of contract, upon the statement of facts set forth in plaintiff's petition, in substance as follows:

"The City of Fort Scott is, and was at the time mentioned therein, a city of the second class, organized under the laws of Kansas. The defendant Company, in the year 1870, was engaged in the construction of a railroad *via* Fort Scott from Sedalia, Missouri, to Denison, in the state of Texas. Said railway company in order to secure aid from the city of Fort Scott, in the construction of its road through the state of Kansas, proposed to said city, that if it would subscribe $75,000 to its capital stock, and issue the bonds of the city

in payment therefor, and also issue the bonds of the city in a sum not exceeding $25,000 for the purpose of procuring the right of way through the city for its road, and of purchasing not·exceeding twenty-eight acres of land for depots, engine-houses, machine-shops and yard-room, it would, within six months from an election thereafter to be held upon the question of issuing said bonds, construct or cause to be constructed and put in operation a line of railroad from Sedalia, Mo., to the city of Fort Scott, and that it would extend the road as soon thereafter as practicable, in a southwesterly direction to a point therein named on the defendant's road; that the company would make said line of railway from Sedalia, or any point northwest thereof to which the company might thereafter extend the line of its road, the great through-line by way of Fort Scott to Texas; that the company would make Fort Scott the end of a division upon its road, and would erect engine-houses and machine-shops at or near Fort Scott, before doing so at any other point southwest of Sedalia, upon the through-line from Sedalia by way of Fort Scott to the Indian Territory and Texas, as soon as the business of the line should, in the opinion of the company, render such shops necessary. Thereupon the city council of the city of Fort Scott passed an ordinance submitting said proposition to the qualified electors of said city, and an election was held in accordance therewith on the 30th of August 1870, and resulted in favor of the proposition contained in the submission. On the 5th of December 1870, the city of Fort Scott subscribed $75,000 to the capital stock of the company, by an ordinance passed on that day. On the 22d of December 1870, the city passed another ordinance giving to the company $25,000 in its bonds, in lieu of the grounds it had agreed to purchase and donate for right of way, etc.; and on the 11th of February 1871, the city delivered $75,000 in the city's bonds to the defendant in payment of such first-mentioned subscription.

"And the plaintiff avers that it has duly kept and performed all the conditions of said contract upon its part, and delivered $100,000 of the bonds of said city to said railway company, which has negotiated them, and they have passed into the hands of innocent purchasers; but said company did not comply with its part of said contract, but on the contrary neglected and refused, and still neglects and refuses to make Fort Scott the end of a division upon said line of its road, and neglects and refuses to locate its engine-houses and ma-

chine-shops, any or either of them, at the city of Fort Scott, or at or near said point; but has located its machine-shops and built its engine-houses at the city of Parsons, which is southwest of Sedalia, on the line of its said road. In the fall of 1873, the defendant did erect engine-houses and machine-shops at the city of Parsons, and have them finished and in operation for the purpose of doing the business of their line of road, contrary to the terms of the aforesaid agreement.

"And plaintiff charges that it has been greatly damaged by reason of the conduct of the defendant in this behalf; that if the defendant had complied with its said agreement, and made the city of Fort Scott the end of a division on the line of its road, and erected the engine-houses and machine-shops at or near said city, the so doing would have greatly increased the business and augmented the population and wealth of the city, and thereby decreased the rate of taxation necessary to pay the interest on said bonds so issued to the defendant. The plaintiff avers that the sole consideration of and for the last-named twenty-five thousand dollars in bonds, was to enable the defendant to purchase grounds for said engine-houses, machine-shops, etc.; and that the defendant received said bonds, negotiated them, and applied the proceeds to other and different purposes, and did not apply the proceeds to the purposes mentioned in the contract. And the plaintiff avers that the said bonds (viz., the $75,000, and the $25,000,) were obtained from the plaintiff by the defendant by lying, fraud, deceit and hypocrisy on the part of the defendant, with the intent to cheat and defraud the plaintiff.

"Wherefore the plaintiff prays and demands judgment against the defendant for the value of the said bonds, and the damages so sustained as aforesaid, to the amount of one hundred thousand dollars."

A copy of the ordinance (Ordinance No. 108) reciting and designating the terms of the proposed subscription, and submitting the question to an election on the 30th of August 1870, was attached to and made a part of said petition. This ordinance, so far as is material, is copied in the opinion, *infra*. The plaintiff attached to its petition, and as a part thereof, Ordinance No. 129, approved December 5th 1870, making the subscription of the $75,000 voted at said election of the

30th of August, which last-mentioned ordinance has a preamble as follows:

"Whereas, heretofore, to-wit, on the 30th of August 1870, a special election was, in pursuance of ordinance No. 108, and of due proclamation, and notice thereof, held in the several wards of the city of Fort Scott for the purpose of submitting to the qualified electors of said city the question of subscribing in the name of said city, $75,000 to the capital stock of the Missouri, Kansas & Texas Railway Company, and of selling and assigning said stock for a nominal consideration to the capitalists engaged in the construction of said railway, under the name of the Land Grant Railway and Trust Company of New York, and of issuing and delivering the bonds of the city of Fort Scott to said company in payment of said subscription, for the purpose of aiding in the construction of the railroad of said company southwestwardly from said city, upon certain terms and conditions in said ordinance contained; and whereas, upon the canvass duly made of the votes cast at said election, it appeared that there were cast in favor of the proposition submitted 523 votes, and against said proposition three votes, and that the same were thereby adopted; and whereas, the terms and conditions upon which said subscription, and the issue and delivery of said bonds to said company depended, have been complied with by the said company: Now therefore, *Be it Ordained,*" etc.

The defendant answered, admitting the due incorporation of plaintiff and defendant, the passage of the ordinances mentioned in the petition, the submission therein provided, the election, the subscription of the $75,000 and the delivery of the city's bonds therefor, and the giving to defendant of $25,000 additional in bonds, as claimed; but defendant denied all the other averments of the petition, and alleged performance by defendant. The action was tried at the March Term 1874 of the district court, (J. M. G., judge *pro tem.,* presiding.) The plaintiff called Samuel Proctor, F. Gould, Geo. W. Chess, and Wm. Fletcher, as witnesses, from whose testimony it appears that Fort Scott is 108 miles southwesterly from Sedalia, and Parsons is 51 miles southwesterly from Fort Scott; that the defendant, the *M. K. & T. Rly. Co.,*

commenced the building and erection of their round-house at Parsons in the fall of 1871, and their machine-shops at the same place in 1872, all of which were in running order in the summer of 1873; that said round-house has fourteen stalls, and is used for the Sedalia branch of defendant's road, and the machine-shops are 100 wide by 300 feet long, and used for repairing machinery and rolling-stock in use on defendant's road; that said round-house cost about $60,000, and said machine-shops about $80,000; that at said shops about sixty-five men were kept constantly employed, whose aggregate monthly pay was about $3,000. Plaintiff also called George A. Crawford, H. T. Wilson, James S. McCord, E. M. Hulett, C. F. Drake, B. P. McDonald, all for many years residents in the city of Fort Scott. Their testimony showed that the population of Fort Scott in 1870 was about 4,000; that it was upwards of 5,000 in 1872 and in 1873, and between 5,000 and 6,000 now, (time of trial, March, 1874;) that real estate was higher in Fort Scott in 1870 than in June 1872, and about one-third higher in June 1872 than in 1873; that defendant had built no machine-shops in Fort Scott; that it was known in July 1872, that defendant had commenced building its machine-shops in the city of Parsons; that the depreciation in the value of property in Fort Scott commenced in 1872, and was from 25 to 50 per cent. lower, according to location; that the decline in property commenced before the panic which caused a depreciation in property in almost all the towns in this state since 1870 and 1872. All this testimony relating to shops and buildings and business at Parsons, and population and values in Fort Scott, was admitted over defendant's objection and exception. The record shows that—

"It was here admitted that these $25,000 in bonds were delivered to the defendant for the purchase of right of way and grounds, as provided in the ordinance of the city of Fort Scott of July 25th 1870, referred to in plaintiff's petition, and accepted by the defendant in full compliance with section eight of that ordinance. It was also admitted by the defendant, that the $75,000 in bonds first mentioned in

29—15 KAS.

plaintiff's petition have passed into the hands of innocent holders."

Defendant called Augustus Wilson and George W. Chess, residents in Parsons, who testified that the population of Parsons in 1872, and also at the time of the trial, was about 2,500, and that real estate in Parsons had depreciated generally from 25 to 35 per cent. as compared with the prices of June and July 1872. O. B. Gunn, a witness called by defendant, testified that—

"The Missouri, Kansas & Texas Railway Company, defendant, within six months from the date of election, at which bonds were voted by the city of Fort Scott, constructed and put in practical operation a line of railway from Sedalia, Mo., to the city of Fort Scott, and immediately thereafter extended the line in a southwesterly direction to the city of Parsons, where it joins another part of its road, called the Neosho Division, and which was formerly known as the Union Pacific Railway, Southern Branch. The company have made the railway from Sedalia the great through-line by way of Fort Scott to the southwest and south, through the Indian Territory to Texas, and they have constructed no other road from Nevada, Mo. The company have erected here at Fort Scott, passenger-house, freight-house and round-house. The freight-house cost $4,700; the passenger-house, $4,000, and the round-house, $3,000, or $3,500."

"It was here admitted that the defendant had purchased the right of way through the city of Fort Scott, and between fifteen and twenty acres of land within the city for depot-grounds, yard-room, and other purposes connected with its business."

H. C. Luey, another witness called by defendant, testified as follows:

"I am the agent of the defendant at Fort Scott. The engines of all freight trains, going both ways, are changed at this point. At least three engines are always kept at Fort Scott."

The transcript does not contain the charge or instructions given by the court to the jury. The defendant's counsel asked the court to give the following instructions to the jury, to-wit:

"1st. If the jury find from the evidence that real estate

in the city of Fort Scott has depreciated in value since June 1872, before they can take that matter into consideration in estimating the damages in this case, they must further find from the evidence that such depreciation was the natural and proximate consequence of the breach of the contract alleged in plaintiff's petition.

"2d. If the jury find from the evidence that such depreciation was the natural and proximate consequence of the acts complained of in the plaintiff's petition, the damages to the plaintiff are remote and speculative, and the plaintiff can only recover nominal damages.

"3d. Before the plaintiff can recover other than nominal damages, it is incumbent on it to show by competent testimony the amount and value of the real estate alleged to have been affected by a breach of the contract set forth in the petition. If the plaintiff has failed to do that in substance, the jury have no data upon which to estimate the damages, and can render a verdict only for nominal damages.

"4th. While the law implies damages for the breach of every contract, if the plaintiff would recover more than nominal damages, it must prove such damages by competent testimony; and the jury cannot infer damages, but must find the same as a fact from the evidence.

"5th. The real question for the jury to determine is, what damages, if any, the plaintiff has sustained in not making the city of Fort Scott the end of a division, and in erecting engine-houses and machine-shops at other points southwest of Sedalia on the through line of railroad from Sedalia by way of Fort Scott to the Indian Territory and Texas, before erecting the same at or near Fort Scott—said damages to be determined by the rules before stated."

The court refused to give the second and third instructions—and the record does not show whether the 1st, 4th and 5th were given, or refused. The defendant also submitted to the court in writing six special questions, and requested the court to direct the jury to find upon the particular questions of fact so stated, and to direct them to return a written finding thereon. Said questions, and the answers thereto, as returned by the jury, and their general verdict, are as follows:

(*Title.*) "We the jury find for the plaintiff, and assess its damages at one hundred thousand dollars.

"To the questions of fact submitted to them, the jury find as follows, to-wit:

"1st. Did the defendant construct its machine-shops and engine-houses at Parsons, before any were constructed at Fort Scott? *Answer*—Yes.

"2d. Has it erected any machine-shops or engine-houses at Fort Scott? *Answer*—No machine-shops; but one small engine or round-house.

"3d. Has it made Fort Scott the end of a division? *Answer*—No.

"4th. If the defendant has failed to construct its machine-shops and engine-houses at Fort Scott, has the plaintiff sustained any damages thereby? *Answer*—Yes.

"5th. If the answer to the last-named question be 'Yea,' how much damage has the plaintiff sustained? *Answer*—One hundred thousand dollars.

"6th. If the jury find plaintiff sustained more than nominal damages, how are such damages made up, and from what data? *Answer*—From the evidence, and from breach of contract."

Upon the return of said jury, and the delivery to the clerk of the court of their written findings to said questions of fact so submitted to them, defendant objected to their answer to the 6th question submitted to them, and requested the court to resubmit that question to the jury, with the instruction to bring in a written finding responsive to the question—which the court refused to do, and defendant duly excepted. Afterward, at the same term, and on the 2d of April, defendant's motion for a new trial was overruled, and judgment was entered on the verdict in favor of the plaintiff for $100,000, and costs. And the record shows that on said 2d of April—

"And by consent of parties, made in open court, it is ordered, that said defendant have thirty days from the date of this entry in which to make a case and exceptions, which case so made shall be served upon plaintiff's attorneys at least five days before the same shall be submitted to the judge *pro tem.* of this court for allowance, settlement and signature. And by like consent of parties, it is ordered, that execution be stayed for forty days from the date."

The transcript shows that defendant's attorney made a "case" and served it on plaintiff's attorneys April 21st 1874.

To the case so served, are appended several papers, to-wit: First—A protest by plaintiff's attorneys, against the settlement of the case by the *pro tem.* judge, denying "the right and jurisdiction of said J. M. G. to sign, make, or allow said case after the adjournment of the court *sine die*, and while the regular judge" was present in the county, and "because no copy of said case as presented was served upon the plaintiff, as required by the court"—to which protest were annexed three proposed amendments to the case. This "protest and amendments" was marked, "Filed with me, April 22d 1874," which indorsement was signed by the *pro tem.* judge. Second—A notice, which after the title is as follows:

GENTLEMEN: Please take notice, that on Friday, the first day of May 1874, at two o'clock in the afternoon, or as soon thereafter as counsel can be heard, I shall present the case made in the above entitled action, and served on you the 21st day of April 1874, to the Hon. John M. Galloway, the trial judge of said case, at his office in the city of Fort Scott, Kansas, for signature and certification. Yours, &c.,

T. C. SEARS, *Attorney for Defendant.*

Which notice has this indorsement—"We admit service of a copy of the within notice, this 29th day of April 1874. McCOMAS & McKEIGHAN, *Plaintiff's Attorneys.*" Third—An affidavit, which, after the title and venue, is as follows:

"T. C. Sears, being duly sworn, deposes and says, that he is the attorney for the defendant in the above entitled action; that on the 21st day of April 1874 he served a copy of the annexed case upon McComas & McKeighan, attorneys for the plaintiff herein; that no amendments have been made, served or suggested by or on behalf of said plaintiff; that, pursuant to the notice served on plaintiff's attorneys April 29th 1874, this affiant went to the office of John M. Galloway, the trial judge of this action, at ten minutes before two o'clock P.M. of May 1st, and remained there without leaving for a moment until half-past six o'clock; that said office was open, but neither the said Galloway nor either of the plaintiff's attorneys appeared there, nor any one in their behalf; that deponent made inquiries as to the whereabouts, but could only learn that the said Galloway left his office about

noon of that day; that at half-past six deponent went to the residence of said Galloway, and was then informed by his wife that she was not aware of his whereabouts, and that he had not been home since morning; that deponent again went to the residence of said Galloway soon after nine o'clock in the evening, but could not find him or hear anything about him.                                     T. C. SEARS.

"Subscribed and sworn to before me this 1st day of May, 1874.         M. V. Voss, *Judge Sixth Judicial District.*"

Fourth—A certificate made by the regular district judge, which after the title is as follows:

"And now, to-wit, May 1st, 1874, it appearing to me that a copy of the foregoing case was served on Messrs. McComas & McKeighan, plaintiff's attorneys, on the 21st day of April 1874, and it further appearing from the notice and admission of service thereof, hereto attached, that the said foregoing case would be presented to the Hon. John M. Galloway (the *pro tem.* judge of this court who tried this cause) for signature and certification at his office at 2 o'clock P.M. of this day; and it further appearing from the affidavit of T. C. Sears, defendant's attorney, hereto attached, that he, the said Sears, attended at the office of said Galloway at the hour mentioned in said notice, and remained there the whole time until half-past six P.M. of this day, and that said Galloway was not there, and neither said McComas nor McKeighan, plaintiff's attorneys, came to said office during said time; and it further appearing from said affidavit (which is hereto attached, and made a part of this certificate) that no amendments to said case have been made or suggested, (wherefore said case is deemed and taken as true;) now, therefore, that the said case so as aforesaid made and served, and the several objections and exceptions therein stated and contained, may be entered and become a part of the record of this cause, I, M. V. Voss, Judge of the Sixth Judicial District, at the instance and request of said defendant's attorney, and in the presence of W. C. Stewart, city attorney, and of counsel for said plaintiff, do hereby order and direct that the said case be filed and made a part of the record herein. Witness my hand at my office, in Fort Scott, at 10 o'clock P.M., May 1st, 1874.                                M. V. Voss, *Judge.*"

A sixth paper attached to said case was the certificate of J. M. G., the trial judge, made and dated May 4th 1874, and

which is copied in full in the opinion, *infra*. The petition in error and transcript being filed in this court, the defendant below, as plaintiff in error, filed in this court a motion, which is as follows:

(*Title.*) "And now comes the Missouri, Kansas & Texas Railway Company, plaintiff in error, and moves the court to strike from the record of said action filed in this court, all that portion thereof purporting to be 'amendments,' and signed by McComas & McKeighan and Stewart, and purporting to have been filed with John M. Galloway, judge *pro tem.*, on the 22d day of April 1874, because—1st, The same was not presented to the party making the case, nor his attorney; 2d, The said paper, or so-called 'amendments,' were not made nor suggested until after the expiration of the time allowed by the statute. And the said plaintiff in error moves to strike out from the so-called certificate of John M. Galloway, *pro tem.* judge, all that portion of said certificate attached to the record herein, commencing with the words, 'and at the same time and place,' and ending with the words, 'and does not contain the charge of the court;' and also, from the last clause of said certificate the words, 'with amendments thereto,' on the ground, 1st, That the same and the whole thereof is surplusage; 2d, That the statements therein contained are intentionally false, and were fraudulently incorporated.

" This motion is founded upon the record filed herein, and upon affidavits to be filed. T. C. SEARS, *Attorney.*"

Subsequently, and on the 27th of October 1874, this court made an order appointing A. A. HARRIS, of Fort Scott, as commissioner "to take depositions in this case in behalf of both said parties, and that he have power as such commissioner to issue subpœnas and bring before him at such time as he may designate, prior to January 1st 1875, any person or persons, and the same with books and papers, to testify what is known to them concerning the matters contained in said motion of plaintiff in error, and to reduce such testimony to writing, and transmit the same to this court on or before the first judicial day of the next (January 1875) term of this court." Said commissioner thereupon took and filed the testimony of W. H. Moore, T. C. Sears, W. C. Webb, John G. Stuart, Ira D. Bronson, and Wiley Anderson, on

the part of plaintiff in error, to sustain said motion, and of W. C. Stewart, J. H. Sallee, J. E. McKeighan, John M. Galloway, James F. Holt, and H. C. McComas, on the part of defendant in error, in opposition to the matters alleged in said motion. Said motion, and the case itself upon its merits, were heard and submitted together. Elaborate briefs were filed by both parties, mainly upon said motion, but as the court (opinion, *infra,*) declined to pass upon the merits of the motion, beyond the question of *power in the court* to grant the motion, all those portions of the briefs addressed to the questions of fact alleged in said motion are omitted.

*T. C. Sears,* for plaintiff in error:

1. Section 547 of the Civil Code, (Gen. Stat. p. 737,) gives to a party desiring to have any judgment or order of the district court, or a judge thereof, reviewed by the supreme court, permission to "make a case, containing a statement of so much of the proceedings and evidence, or other matters in the action, as may be necessary to present the errors complained of, to the supreme court." Section 548, as amended, (Laws of 1871, p. 274,) provides, that "the case so made, or a copy thereof, shall within three days after the judgment or order is entered, be served upon the opposite party or his attorney, who may within three days thereafter *suggest amendments* thereto, in writing, *and present the same to the party making the case, or his attorney.*" Sec. 549, as amended, (Laws of 1870, p. 168,) provides, "that the court or judge may, upon good cause shown, extend the time for making a case, and the time within which the case may be served; and may also direct notice to be given of the time when a case may be presented for settlement after the same has been made and served, *and amendments suggested,* which, when so made and presented, shall be settled, certified and signed by the judge who tried the cause. * * * If no *amendments are suggested by the opposing party, as above provided, said case shall be taken as true, and containing a full record of the cause, and certified accordingly.*"

On the 21st of April 1874 a copy of the proposed case was served on the attorneys of defendant in error. On the 29th of April a notice was served on the same attorneys that the case would be presented to the *pro tem.* judge on the 1st of May following, at 2 o'clock P.M., for signature and certification. This notice was quite unnecessary, as no amendments had been suggested, and the case was settled, as we claim, by law.

It is a conceded fact that no amendments in writing were "presented *to the party making the case, or his attorney.*" Now, § 548 clearly governs when the case is made within the three days. It provides that "the case and amendments shall be "submitted to the judge who shall settle and sign the same." Section 549, as amended, after giving the court or judge power to extend the time for "making a case, and the time within which the case may be served," gives the court or judge the further power "to direct notice to be given of the time when a case may be presented for settlement *after the same has been made and served, and amendments suggested,*" etc. So that the court or judge may direct within what time the defendant may "make a case." The court in this case gave the plaintiff in error "thirty days from the date of this entry, in which to make a case." The only further order pertaining to the case was, that it should "be served upon plaintiff's attorneys at least five days before the same shall be submitted to the judge *pro tem.* of this court for allowance, settlement and signature." These provisions of the order were complied with literally. The statute then further provides that notice may be given of the time when the case may be presented for settlement "after the case has been made and served, and amendments suggested." It does not, by implication or otherwise, change or affect in any respect the provisions of § 548, that "the opposite party may, within three days thereafter, suggest amendments thereto in writing *and present the same to the party making the case, or his attorney.*" Now comes the last clause of the section: "And if no amendments are suggested by the

opposing party, as above provided"—that is, in the previous § 548—"said case shall *be taken as true.*" Counsel for defendant in error claim that the force of this last clause is broken by pretended "amendments" alleged to have been filed with the *pro tem.* judge on the 22d of April, the day after the service of the case. Granting that the paper which Galloway attached to the case was filed *with him* on the day it purports to have been, *it is no compliance with the statute,* and has no more significance than if counsel had filed it in their own office. The law only gave the opposite party the right, within three days after the service of the case to suggest amendments, and directs the manner in which they shall be served. And these pretended amendments are no part of the record, and must be disregarded. It is palpable that no amendments were "presented to the opposite party or his attorney," and the right to make them was gone. If the statute of 1870 be construed to mean what it says, viz., that "if no amendments are suggested by the opposing party as above provided, said case shall be taken as true," then the right to suggest amendments was absolutely gone, and all that Galloway had the power to do was to certify the case. Hence the matters contained in his certificate, further than was necessary to certify that it might become a part of the record, are surplusage.

2. The powers and duties of a judge *pro tem.* are referred to by attorneys for defendant in error, and it is contended that they are restricted to the time while such judge is *holding court.* Such is not the meaning of the statute. The words "while holding court," are not a limitation, when taken in connection with the remaining part of the sentence: "The judge *pro tem.* shall have the same power as the regular judge *while holding court, and in respect to cases tried before him, or in which he may be selected to act.*" If the construction sought to be established by counsel for defendant in error had been contemplated, it would have read "while holding court in respect to cases tried before him." The word "*and*" clearly indicates that he is to have such power

"while holding court," *and* in respect to cases tried before him, *or* in which he may be selected to act; that is, when a case is tried before him, his powers and duties *to the end*, are the same as the regular judge. Such judge *pro tem.* is a trial judge, as contemplated in the amendment of 1870 made to § 549. The judge is not to determine whether any allegation is or is not proved, but to certify *as a matter of fact* what the rulings of the court were, and what the witnesses said. The legislature could have conferred this authority upon any other person, as well as the trial judge. The pretense that the act of 1870 is unconstitutional, as containing more than one subject, is hardly worthy of consideration.

3. The issues really made by the pleadings are: 1st, That the railway company neglected and refused to make Fort Scott the end of a division, and neglected and refused to erect its machine-shops at Fort Scott, before it did so at any other point southwestwardly from Sedalia. 2d, That by reason thereof the city of Fort Scott has been greatly damaged in this, viz., "That if the defendant had complied with its said agreement and made the city of Fort Scott the end of a division on the line of its road, and erected the said engine-houses and machine-shops at or near said city, *the so doing would have greatly increased the business and augmented the population and wealth of the said city, and thereby decreased the rate of taxation necessary to pay the interest on said bonds so issued to the defendant.*"

The allegation in the petition that "the sole consideration of and for the said $25,000 in bonds, was to enable the defendant to purchase grounds for said engine-houses and machine-shops, etc.," is flatly contradicted by ordinance No. 108, § 8. The averment "That the defendant received said bonds, negotiated them, and applied the proceeds to other and different purposes, and did not apply the proceeds thereof to the purposes aforesaid," (supposing that the "purposes aforesaid" refer to the matters mentioned in said § 8,) is disproved by the plaintiff's own admission on the trial, "that the defendants had purchased the right of way through the city of

Fort Scott, and between fifteen and twenty acres of land within the city for depot-grounds, yard-room and other purposes, connected with its business."

The power of the city of Fort Scott to make the subscription to the capital stock of the defendant company, and to issue its bonds in payment therefor, is given in §§ 51, 52 and 53 of chapter 23 of Gen. Stat. of 1868. Section 51 provides that "The board of county commissioners of any county, the city council of any city, or the trustees of any incorporated town, may take stock for such county, city, or town in, or loan the credit thereof to, any railway company duly organized under this or any other law of the state." The remaining sections above cited, provide for the manner in which such subscription can be made, and how it can be paid, but do not in terms make provision as to the method by which any of the corporations named might "loan its credit." The general powers of cities of the second class, are found at § 4 of ch. 19, Gen. Stat. of 1868, and are as follows, viz.: * * *  *Second*, To purchase and hold real and personal property *for the use of the city;* * * * *Fourth*, To make all contracts and do all other acts in relation to the property and affairs of the city, *necessary to the exercise of its corporate or administrative powers.*" * * * Section 5 then provides "That the powers hereby granted shall be exercised by the mayor and council of such cities, as are hereinafter provided." These statutes were passed by the legislature at the same session. It is clear from the provisions made for subscription to the capital stock of the company, and the payment thereof, that the legislature did not intend to confer that authority in the general powers delegated to cities of the second class. It is equally clear that the examination of those powers as enumerated, demonstrates the fact that the legislature did *not* delegate any such powers. The only authority comes from §§ 51, 52 and 53, ch. 23 of Gen. Stat. What authority then did this latter statute confer? Simply to permit the city to subscribe to the capital stock of the railway company, and pay up such subscriptions in its bonds, or loan its credit to

such company. No authority was given to enter into speculations in building machine-shops, engine-houses, speculating in real estate, or any such thing. If it had entered into a contract for such subscription or loan, with the conditions that are attached to the ordinances herein, it is barely possible it could enforce it in case of breach, by a recovery in damages—but only such damages as would bear a *pro rata* proportion between those conditions performed, and those not performed. In other words, that it could only make such a contract as would itself furnish the measure of damages. It could take the necessary measures to protect itself *in what it paid*, but no further. Profits *outside*—mere results—disconnected with the consideration paid or received, although growing out of the contract, cannot inure to a municipal corporation. Individuals or localities within the corporate limits may be benefited, and make great gains, by the establishment and operation of machine-shops, the construction of engine-houses, depots, etc., that may have been secured by municipal liberality and expenditures; but the *municipality*, never. Its powers are restricted to purely municipal objects, and its property to municipal uses, only. This court has fully sustained this position in the case of the *City of Leavenworth v. Norton*, 1 Kas. 432. "All powers," says the court, "not expressly granted by the charter, or necessary to carry out the powers expressly granted, are denied. The corporation can take nothing by implication." The same doctrine is recognized in *City of Leavenworth v. Rankin*, 2 Kas. 357. But independently of such restricted powers, I submit that the conditions upon which this subscription was made and paid, constitute such a contract, and *only* such an one, as furnishes its only measure of damages in case of breach. (Sedgwick on Damages, 236.) The only damages alleged in the petition are contained in the following paragraph, viz.: *"The so doing would have greatly increased the business and augmented the population and wealth of said city,* and thereby decreased the rate of taxation necessary to pay the interest on said bonds, so issued to pay said defendant." The "City of

Fort Scott" holds no legal relation whatever to the business, population, or wealth within its corporate limits. It has no title, legal or equitable, to any of the property of citizens within its jurisdiction, and can *acquire* none except for municipal purposes. Its citizens are in no sense stockholders, and the city is in no sense a trustee. If it may, under legislative permission subscribe to the stock of railway companies, upon conditions providing for the construction of machine-shops, engine-houses, etc., it may, under the guise of such permission, by attaching the necessary conditions to such subscription, embark in speculative adventures *ad libitum* — thus calling into exercise corporate functions that are expressly prohibited. For the purposes of this argument, I admit that it may enforce the performance of the conditions upon which the subscription was made, provided they are legal and mutually operative. But in case of breach, it can only recover such damages as grow *out of the contract,* and then to be measured *pro tanto.* In the case at bar it is conceded that the railway company performed all the conditions except making Fort Scott the end of a division, and erecting at or near the city, machine-shops, etc., before doing so at any other point southwest from Sedalia. What proportion does the nonperformance of *these* conditions bear to *all* the conditions attached to the subscription? That proportion ascertained, the measure of damage is easily fixed; and it is the only legal rule by which they can be fixed.

The damage alleged in the petition is too remote — purely speculative. Who can say, or who can give an intelligent opinion, (which is not testimony,) that "the so doing would greatly have increased the business, and augmented the population and wealth of said city." The allegation of the petition *attempts* to make a statement of what can only be characterized as "loss of profits." In this class of cases the contract furnishes the measure of damages by fixing data capable, by the aid of evidence *aliunde,* of reducing the damages to almost mathematical certainty. But in this class of cases there must be proof — conjecture will not do. (42

Penn. St. 435; 16 N. Y. 489; Sedg. on Damages, 72.) The breach of every contract carries with it, *ipso facto*, the right to recover *nominal* damages. If a recovery is to be had beyond them, it can be sustained only by competent evidence. The petition in this case alleges a breach. The right to recover nominal damages follows as a matter of course; hence the defendant could not demur. Beyond this right to recover nominal damages upon the allegations of the petition, it is submitted that the petition states no cause of action whatever, nor one that could by any proper amendment be made sufficient.

The contract between the defendant company and the city of Fort Scott was an entirety. Upon the face of the petition, it is alleged that the city performed its part, and that the company did not perform *all* the conditions imposed upon it; thus admitting that it *did* perform all of its obligations except those specifically enumerated, viz., the failure to make Fort Scott the end of a division, and to construct engine-houses and machine-shops. Now, as the contract, (as I contend,) was one that itself furnished the measure of damages, what evidence under this petition, could the plaintiff offer? It is clear to my mind what it could *not* offer: It could offer none to prove that the making of Fort Scott the end of a division, and the construction there of the machine-shops before so doing at any point southwest from Sedalia, would "have greatly increased the business, and augmented the population and wealth of said city," because—it was entirely outside of the contract; it was too remote—purely speculative; it was a damage to the persons owning or interested in the property or business in Fort Scott—if to any one—and not to the plaintiff, a municipality. There was no allegation as to the kind of engine-houses, machine-shops, etc., whether they should cost one thousand dollars, or one hundred thousand dollars, and the contract was silent upon that point. The ascertainment of the damage, therefore, if there were no other difficulties, is simply impossible. There are no damages other than nominal, following the allegations in the

petition, except when special damages are alleged, and, as I have shown, those cannot be sustained. No evidence could be given under the allegation, "that the defendant received said bonds, negotiated them, and applied the proceeds to other and different purposes, and did not apply the proceeds to the purposes aforesaid," because this delivery was in lieu of *one* of the conditions of the contract, and the contract was one entire thing; and the petition does not aver that the defendant did not purchase the grounds within the city limits for its right of way, depot-grounds, yard-room, etc. It alleges that the sole consideration for the said $25,000 in bonds, was to purchase grounds for said engine-houses, machine-shops, etc., and then alleges it did not apply the proceeds to the "purposes aforesaid." The statement as to the "sole consideration," is contradicted by the ordinance, § 8. It did not agree to apply the proceeds to the purchase of any grounds. If it purchased the grounds, that was sufficient, and the plaintiff does not allege that it did not. Nor could any evidence be given under the allegation "that the said bonds, (viz., the $75,000 and the $25,000,) were obtained from the plaintiff by the defendant by lying, fraud, deceit and hypocrisy on the part of the defendant, with the intent to cheat and defraud the plaintiff," because this alleges no fact. What the lying, deceit, fraud and hypocrisy were, the indignant pleader does not tell us. Until he does that, we are not compelled to pay him much attention. But the petition itself disproves the allegation.

Therefore I submit that no evidence was admissible, and none could be made admissible under any allegation in the petition. Hence, plaintiff in error insists as alleged in its petition in error, "that the facts set forth in said petition are not sufficient in law to maintain the aforesaid action against the Missouri, Kansas & Texas Railway Company; in any event for no more than nominal damages."

4. The plaintiff in error submitted to the jury certain particular questions of fact, and among them designated as No. 6, the following: "If the jury find plaintiff sustained more

than nominal damages, how are such damages made up, and from what data?" To this question the jury returned the following answer: "From the evidence, and from breach of contract." The record shows that the defendant objected to the answer as not responsive to the question, and requested the court to so inform the jury, and to instruct them to respond to it in accordance with the interrogatory; but the court refused the request, and refused to re-submit the question to the jury. The ruling of the court in this respect was clearly erroneous. The statute in force at the time of trial was passed in 1870, amending § 286 of the code. This provision is mandatory. This court held in case of the *L. L. & G. Rld. Co. v. Rice*, 9 Kas. 432, that the language with reference to special verdicts made it obligatory upon the district court to order a special verdict, whenever both or either party demanded it. If the statute be mandatory, and the district court is bound to make the submission upon the request of either party, it must follow that it is equally mandatory upon that court to see that the law is not evaded or set at defiance by the jury. The *mere form* of submission, is not a compliance with the law. The question under consideration was not answered. The jury knew it, and the court knew it. The inquiry was directed to the very fact that was controlling in the case, and it was for this very reason that the court and jury purposely evaded it.

What were the constituent elements of such damages? Were they in the fact "that real estate in the city of Fort Scott had depreciated since 1872?" Were they in the fact that the "business" of the city had not "greatly increased," and its "population and wealth greatly augmented," or was it, that the defendant had obtained the bonds by "lying, fraud, deceit and hypocrisy?" The object of the law was, to enable parties and the court to ascertain how, upon what basis, upon what facts, they made up their verdict; and, if they should find a state of facts, or a single important fact, inconsistent with their general verdict, that it should then be in the power of the court to correct the wrong, and do justice

30—15 KAS.

between the parties. "From the evidence, and from breach of contract," say this honest, intelligent jury. And an equally honest and intelligent judge decides honestly and intelligently that it is an honest and intelligent answer to the question! The *law* gave to the defendant the right to *compel* this jury to inform it and the court *how the plaintiff was damaged.* And a really honest, intelligent jury would not hesitate long to answer the question how they made up their damages, from what data, in rendering a verdict for $100,000. The refusal of the court to re-submit the question, was the denial to the defendant of a substantial right; and this court will not stop to inquire whether it was injured or not. It will adopt the language of the New York court of appeals in the case of *Clark v. Norton,* 49 N. Y. 246: "It is no answer to say that the plaintiff has sustained no injury. Courts cannot speculate as to probable or possible injury resulting from a departure from the statutory regulations touching the rights of person or property of others."

5. Plaintiff put to the witness William Fletcher the following question: "You may state, if you know, what amount the M. K. & T. Rld. Co. pay monthly to their employés at the machine-shops above spoken of?"—(those at Parsons.) The question was objected to by the defendant, on the ground that it was incompetent, irrelevant and immaterial. The court overruled the objection. The witness answered, "For the last two months it has been something over $3,000 per month." In any possible aspect, the question was incompetent for any purpose whatever. The only object counsel could have had in view was to furnish the jury some data, upon which to estimate the damages the city of Fort Scott had sustained because the machine-shops were not located there. As I have argued before, the city of Fort Scott could not recover consequential damages, under the contract with the company, and the question was directed only to damages of that character. The money the company paid to its *own employes* for their service, *if they had been residing at Fort Scott, and the money paid them there,* would have no effect in

any way upon that city *as a municipality.* The fact that this very money should be spent in that city, distributed among its different classes of trade, could in no possible legal sense affect the *corporation* of Fort Scott.

I have before referred to the fact that the contract between the city and the company failed to describe the character of the shops to be erected—their extent and capacity. The contract would have been fulfilled by the erection of shops that might cost not to exceed one thousand dollars, and the employment of half a dozen operatives. The erection of shops of greater extent at Parsons, and the employment of a much greater operative force there, furnish no sort of evidence as to what the company ought to do under their contract with the city of Fort Scott. The necessities for extensive shops at Parsons might be apparent, while at Fort Scott, those of much smaller capacity might supply the demands of the company. The *assumption* that the contract called for shops at Fort Scott similar to those at Parsons, is unauthorized. Hence, any evidence based upon it is clearly incompetent, and might mislead the jury. So, also, the assumption that the same number of hands *ought* to be employed at Fort Scott as at Parsons, receiving and paying out the same amount of money per week or per month, is equally unauthorized.

6. Plaintiff in error excepted to the introduction of testimony as to the comparative value of real estate in Fort Scott during the years 1870, 1871, 1872, 1873, and 1874. The evidence on this point shows—1st, that real estate in the city of Fort Scott had depreciated in value since July 1872; and 2d, that the fact became generally known in Fort Scott that the railway company had commenced the erection of shops at Parsons, "sometime in July 1872," from which it was claimed that the jury might infer that the latter fact caused the depreciation of real estate of sundry citizens of Fort Scott, and that thereby they might find that the *city of Fort Scott* had been damaged in the sum of *one hundred thousand dollars!* The legal aspect of this kind of evidence has already been

discussed. It was incompetent in any and every view of the case. The jury, from these facts alone, had no *right* to draw such inference. If the people of the city of Fort Scott concede the fact, that their prosperity and the value of their property depended upon so comparatively a trifling circumstance as the location of machine-shops "at or near their city," they admit what I, who have some knowledge of their business and resources, and the energy and enterprise of its leading citizens, do not believe.

But all this testimony is clearly improper for another reason. If the proposed evidence tended to prove anything in the way of damages, they were *special damages*. Special damages cannot be proved nor recovered without special allegations in the petition. The plaintiff's petition contains no allegations of that character, and none that can be construed as embracing them. As before shown, the only special damage alleged is, that the "business would have been greatly increased," and the "population and wealth of the city greatly augmented." It cannot be pretended that such a plea justifies the introduction of evidence to show that there has been a depreciation of the real estate in the city. The one contemplates a "loss of profits" that would have accrued; the other, the loss of actual value of a thing already possessed. 1 Chitty's Pleading, 385; 19 Johns. 228; 4 Denio, 319; Sedgwick on Damages, 67. Again, it is a fact well known to every intelligent citizen, that there has been a general depreciation of real estate, in every portion of the west — in the towns and cities particularly; and it is a fact which constitutes a part of the experience and common knowledge of the day. Hence, a fact of which the court will take judicial knowledge. *Oppenhein v. Wolf*, 3 Sandf. Ch. 571. Of facts that are "matters of public history, affecting the whole people," no proof is needed; courts take judicial notice of them. 1 Greenl. on Ev. 8; 37 N. Y. 174; 43 Barb. 225; 1 Woolw. 217; 44 Ala. 89; 16 Cal. 220.

Thus, the evidence as to the depreciation of real estate in Fort Scott proves nothing as to damages as resulting from

the failure of the company to erect their machine-shops at that point, because there was a *general depreciation* throughout the whole state.

7. It was error to refuse to give the special instructions asked for by plaintiff in error. The first instruction was based upon the theory that the jury would find any fact necessary to give a verdict against the defendant. The result showed the correctness of the theory. If given, it would have instructed them that if they found from the evidence that real estate in the city of Fort Scott had depreciated in value since June 1872, before they could take that matter into consideration in estimating the damages in the case, they must further find from the evidence that such depreciation was the natural and proximate consequences of the breach of contract alleged in the plaintiff's petition. Of course, the jury found the fact, and the further one that such depreciation was the natural and proximate consequence of the breach of the contract.

The second instruction asked was to the effect, that if the jury found from the evidence that such depreciation was the natural and proximate consequence of the acts complained of in plaintiff's petition, the damages to plaintiff are remote and speculative, and the plaintiff could only recover nominal damages. This instruction, the court refused to give. The questions involved in this instruction, and refusal, have been considered in a previous portion of this argument. The proposition is too evident to require a word more of argument.

8. As to the whole case, upon the evidence submitted, I have a few words to say. The fact that machine-shops were constructed at Parsons before they were at Fort Scott is not denied; that such act on the part of the company is at least a technical violation of the contract, is evident. I have no doubt the company had good and sufficient reason for such action. But, if it is liable for such breach, such liability should be enforced in accordance with the rules the law has established, and not by dishonest, fraudulent means. There

is absolutely no testimony tending to show any fact that can justify the verdict of the jury, and, under the allegations of the petition, none was admissible. Conceding every fact alleged in the petition, to have been proved, the verdict could not be sustained. The contract between the city and the company was performed by the latter in the main. The railroad was constructed, depots built, right of way purchased, land bought for depots, engine-houses, yard-room, etc., and every real, substantial condition performed. The city has secured for all time its benefits for the purposes of business, convenience and taxation. The great controlling object for which the subsidy was given has been obtained. But all this it ignores, and asks, that it may recover back the full consideration it agreed to pay, because, forsooth, some portion of the contract has not been performed.

*McComas & McKeighan*, for defendant in error:

1. In respect to the motion in this case, which is in effect an effort to induce this court to change the certificate of the judge of the district court to a case made, we submit: 1st, This court possesses no power to grant such a motion. 2d, The only thing the plaintiff in error can with any show of justice complain of is the statement in the certificate that the "case" made does not contain all the evidence. Upon the evidence taken under this commission, is this court satisfied that it does? If not, then the certificate is true, and to change the certificate would be compelling the district judge to certify to a falsehood. If this were an application to compel his signature to the certificate prepared by plaintiff in error, this court would say, "the decision of the trial judge that a bill of exceptions tendered him for his signature is untrue, is final and conclusive." Yet here the judge signs "the case made," and says in his certificate that it does *not contain all the evidence*, and the plaintiff in error asks that his certificate in this respect be modified. This is an attempt to do indirectly just what this court in *Shepard v. Peyton*, 12 Kas. 616, decides cannot be done. (See also, *Gulf Rld. Co. v. McClure*, 9 Kas. 373.)

The plaintiff in error alleges aggrievance by the statement of the judge in his certificate that the case made does not contain the charge of the court. *It does not contain it.* The case is before this court to speak for itself. Should the judge tell the truth, and say the case made did not contain the instructions, or sign a certificate which is not true? Sec. 275 of the code provides: "When the argument is concluded the court shall give general instructions to the jury, which shall *be in writing, and be numbered, and signed by the judge,* if required by either party." Now this record does not show, the pretended case made does not show, the plaintiff in error does not attempt by his depositions to show, that either party required the court to reduce its charge to writing, and number and sign the instructions. The most that is claimed is, that the charge was in writing; that after it was delivered the judge *pro tem.* handed it to Sears; that he read it, handed it back to the judge, stating, "there are one or two points to which I wish to except." Is there any way for this court to find out what these points were, or did he inform the court below? Is it our fault that the error, if there was any, is not made affirmatively to appear? The most that can be claimed is, that the judge made a written charge without being requested so to do; that it was not excepted to, except by the attorney stating to the court that there were "one or two points to which he wished to except," without stating what they were, or excepting to the asking, or that any specific exceptions be allowed, and noted on the record; and the said charge was lost, or mislaid, and no copy has been supplied. These are the only material changes that the plaintiff in error seeks to make in the certificate by this motion, that is, the statement that the case made does not contain all the evidence, and does not contain the instructions of the court. To this modification we object because, 1st, this court has no power or authority to change the certificate; 2d, if it had, it will not do it, because the evidence shows that the certificate in this respect is true.

2. The plaintiff in error claims that under the statute of

1870, (Laws of 1870, page 168,) there could be no amendments to this case made, because no amendments were *served upon the opposite party*, or its counsel, and the judge was bound to sign it as it was. The material portion of said statute is as follows:

"SECTION 549. The court, or judge, may, upon good cause shown, extend the time for making a case, and the time within which the case may be served; and may also direct notice to be given of *the time when a case may be presented for settlement* after the same has been made and served, and amendments suggested, which, when so made *and presented*, shall be settled, certified and signed by the judge who tried the cause." * * * "And if no amendments are suggested by the opposing party, as above provided, said case shall be taken as true."

That is, when so presented to the judge within the time. Now, this statute will not bear·the construction attempted to be given to it. Under the order in this case, made by consent, the plaintiff in error has thirty days·in which to make a case. *No time is fixed within which defendant in error was to suggest amendments.* Such amendments could therefore be suggested at the time when the case was presented for settlement; this matter is governed by this consent order; this does not require that the amendments should be served upon any person.

"If no amendments are suggested, etc., the case shall be taken as true." When shall it be taken as true? When the case *is made and presented to the judge?* And this case was not presented until the time had expired within which it was to be presented. Plaintiff in error had thirty days within which it might make and present to the judge for settlement a case. When the thirty days had expired, the power of the judge was exhausted. He could neither settle it, nor certify it. At least, before they can get the technical advantage they claim under this statute, by reason of no amendments being properly served, a compliance with the order of the court must be shown on the part of plaintiff in error. But it is contended that the case was prepared, and on the afternoon

of the twenty-ninth day after the order of the court the attorney was at the office of the *pro tem.* judge, and the judge was not there. And also that the attorney called at the judge's office several times the next day, and did not find him. Suppose this case had been tried before the regular judge, and plaintiff in error had been given thirty days in which to make a case, and that he waited until the last day in the afternoon, or until the next to the last day, and then went to the office of the judge and found that he had left the county that morning, going perhaps to hold court in another county, and that he did not return until the time had expired: whose fault would it be that no case could be settled? In this case the cause was tried before a *judge pro tem.* The plaintiff in error does not ask the court to charge the jury in writing; does not preserve or except to the charge of the court; files no bill of exceptions; takes thirty days to make a case; lets twenty-eight days of the time expire; comes to the law-office of the lawyer who acted as *pro tem.* judge, but serves no notice upon him to be at his office that day; finds him absent; spends the afternoon at such office; does not see the *pro tem.* judge until two days after the time has expired; then presents the case, not for "settlement," but for "signature and certification," and now claims that this court must change Galloway's certificate so as to make it show a falsehood, because no amendments were served upon the opposite party or his attorney by the defendant in error. At most, such a "signature and certification" could only be made when the case is "presented to the judge." In law it was never presented, as the whole proceeding upon the 4th day of May was a nullity.

3. But if we take the transcript as it is, what does it show. It appears from this record that there is here what is claimed to be "a case made" under the provisions of the statutes, to which document there are two certificates, one by the regular judge, who did *not* try the case, certifying that "the case" is correct, and another from the judge *pro tem,* who *did* try the case, certifying that such "case made" is not correct. It

further appears from the record that the regular judge's certificate is based upon an affidavit filed before him by the attorney for the plaintiff in error, showing that upon one day he went with his case to the office of the judge *pro tem.* to have it settled and signed, and remained there from 12 o'clock M. to 6 o'clock P.M., without finding the judge *pro tem.*, and not showing that he notified the judge *pro tem.* that he would be there on that day, or that he made any attempt on any day before or after that, within the thirty days he was given by the court to make a case, to see said judge *pro tem.*, or to get him to settle and allow said case —which affidavit is no part of the record or proceedings in this case, and can only be considered by the court as a matter of legal curiosity. It appears, from the certificate of the regular judge, that the sole ground upon which he certified to the correctness of the case made, was the statement in the said affidavit that no "amendments" were suggested to the case by the attorneys for the plaintiff below, while the certificate of the judge *pro tem.* shows that such amendments *were* suggested, and a copy thereof handed to him the day after the pretended case was served upon said plaintiff's attorneys, and he further certifies that said amendments were correct. "Under which king?" Whose certificate to the case are we to take? Who is to settle the case—the judge who tried it, and who heard the evidence, or the judge who *did not* try the case, and who did not hear the evidence? The fact that the regular judge in his certificate professes to make it at the request of the attorney for plaintiff in error, and upon an *ex parte* affidavit, made not in the cause, but before him at chambers, of itself demonstrates his utter want of authority in the premises.

It is the duty of the trial judge to settle the case. "The case and amendments shall be submitted to the judge, who shall settle and sign the same, and cause it to be attested by the clerk and the seal of the court to be thereto attached." (Laws of 1871, p. 274.) The attestation of the clerk and seal of the court are attached to the case as signed by the judge *pro tem.* on the 4th of May, and not to the certificate

of the regular judge on the 1st of May. We therefore contend that the certificate of the regular judge, appended to said supposed "case," is irregular, unauthorized and void, and will be disregarded by this court. *Hodgden v. Ellsworth Co.*, 10 Kas. 637.

4. In regard to the case settled and signed by the judge *pro tem.*, we say that that also, and every part thereof, should be disregarded, and that none of the questions attempted to be thereby raised can be considered by the court, for the following reasons: 1st, This pretended case made is not a case, but simply a bill of exceptions. Bills of exceptions *must* be signed *during* the term. Code, § 300. "A case" is "so much of the proceedings and evidence, or other matters in the action, as may be necessary to present the errors complained of to the supreme court." Code, § 587. 2d, The judge *pro tem.* was elected to hold the March term on account of the sickness of the regular judge. What are his powers and duties? These are prescribed in § 8 of ch. 28, Gen. Stat. p. 304: "The judge *pro tem.* shall have the same power as the regular judge *while holding court*, and in respect to cases tried before him, or in which he may be selected to act." "He shall have the same power as the regular judge," with this limitation, that such power is to be exercised "while holding court." The other two clauses being a further limitation of power, this power must not only be exercised *while holding court*, but it must be "in cases tried before him" while he is holding court, or in cases "in which he may be selected to act"— that is, cases on the docket of the term when he is elected. He has this power "while holding court," as court, and not as a judge at chambers. The judge *pro tem.* has such power as is given by statute, and none other. This statute must be strictly construed, and the powers of the judge *pro tem.* cannot be extended by implication or constructions. This is the general rule in respect to all bodies of limited or special jurisdiction.

The judge *pro tem.* may be selected for two purposes: One is where the disability of the judge extends to a par-

ticular case; there he would have authority, perhaps, over that case until it was ended; the other is where the disability of the judge extends to all the cases on the docket, as in case of the sickness of the judge. In the latter case his authority ends with the term. When court adjourns *sine die,* his official life is terminated; beyond that he has no power, as judge, or court, and no order he can make, by consent or otherwise, can confer power not given by statute, or extend his jurisdiction beyond the time when "he is holding court." His power is given "while holding court," and it dies with the term. Therefore, a judge *pro tem.,* after the adjournment of the term for which he was elected, has no power or right to "settle" and "sign" a case, or cause "it to be attested by the clerk, and the seal of the court to be thereto attached." Sec. 1 of the act to amend the code, Laws of 1871, page 168, does not apply to this class of cases: "Where the term of office of the trial judge shall have expired, or may hereafter expire, before the time fixed for making, settling, or signing a case, it shall be his duty to certify, sign or settle the case; in all respects the same as if his term had not expired." This language has no reference to a judge *pro tem.,* but to the trial judge — the regular judge who tried the case. The judge *pro tem.* has no "term of office" in the sense of the language used. This act is unconstitutional: (art. 2, § 16.) It contains more than *one* subject, in this, that it provides for the making and settling of a case, and also for extending the term of office of a district judge; and it repeals § 549 of the code, to which it is an amendment. It attempts to extend the term of office of the district judge, which is fixed by the constitution. By § 5, art. 3, const., the district judges hold their office for four years, and by § 12, until their "successors shall have been qualified." The term of office of a judge, therefore, cannot expire until the four years have expired, and until his successor "shall have been qualified." After "the term of office of the trial judge shall have expired," which can only be after his "successor shall have been qualified," he has no judicial power, and an act attempting to

confer it upon him is unconstitutional and void—would be in effect to have two district judges in one district exercising their several functions at the same time.

It is claimed by counsel for plaintiff in error, that because notice of amendments to the case was not served upon him, but handed to the judge, the case should be considered correct. The provisions of § 1, of the laws of 1871, page 274, only apply when the time for making the case is *not* extended: "The case so made, or a copy thereof, shall within three days after the judgment, or order, is entered, be served upon the opposite party, or his attorney, who may within three days thereafter suggest amendments thereto in writing, and present the same to the party making the case or his attorney." Under this section the duty of the judge is to "settle the case," amendments or no amendments. It is not this section which provides if no amendments be suggested "the case shall be taken as true." This provision is § 1, laws of 1870, page 168, and is an amendment of § 549 of the code, and contemplates cases only where the time for making the case is extended by the court, and this section is silent as to whether the amendments shall be suggested to the court.

The order of the court gave the plaintiff in error thirty days from the date of the order to make a case, and afterward, before the case was made, adjourned *sine die.* This was April 2d, 1874. The order is as follows:

"And by consent of parties, made in open court, it is ordered that said defendant have thirty days *from the date of this entry,* in which to make a case and exceptions, which case so made shall be served upon the plaintiff's attorney at least five days before the same is presented to the judge *pro tem.* of this court, for settlement, allowance and signature."

No time is given for amendments. Under this order we contend that it was the duty of the judge *pro tem.,* if he had any authority in the premises, to settle the case if it was presented to him in thirty days. The case was not presented to the judge until *thirty-two* days had expired. It was then too late. The order giving the plaintiff in error thirty days in which to make a case, does not mean thirty-two days. So,

in any view of the case, we maintain that the court can only consider such questions in this record as arise outside of the pretended case made.

5. The first error complained of is, that the court refused to give special instructions asked for by the plaintiff in error. We answer: The record outside of this pretended case made, does not show any such instructions were asked for. Neither the record, nor pretended case, shows what instructions the court did give, or that the court was asked by either party to instruct the jury in writing. It is not necessary for the court to repeat its instructions: 3 Kas. 152; 5 Kas. 312; 6 Kas. 371. The instructions asked for by plaintiff in error, *might* have been in the general charge. Error must be made to affirmatively appear. This is the settled doctrine of all appellate courts: 6 Kas. 39, 356; 8 Kas. 473; 10 Kas. 620, 625. Equally universal is the presumption that the court below did its duty: 4 Kas. 536. Where the charge of the court is omitted from the record, the supreme court will presume the proper instructions were given, and on this presumption will not examine instructions refused: 7 Kas. 280. As a whole, the instructions asked for by the plaintiff in error are not law, and ought to have been refused: 6 Kas. 88.

6. The second error complained of by plaintiff in error is, that the facts set forth in the petition are not sufficient to entitle the plaintiff in error to more than nominal damages. Why not? If *under any proof* that could, or might be offered, under the allegations of the petition, the plaintiff could show itself entitled to recover $100,000, then the petition states facts sufficient to justify the verdict. The amount of damage in actions of this character can only be ascertained from the evidence: § 128 of the code. The "advantages" or "benefits" from a "public improvement," railroad, or machine-shops are susceptible of being estimated by the jury under proper evidence and instructions: 31 Mq. 407; 2 Scam. 208, 210, 226.

Suppose the railway company had received and appropriated these bonds without complying with any of the stipula-

tions of its contract? The city could not defend against the bonds in the hands of innocent purchasers for value. Its only remedy would be to pay them, and sue upon the contract. Certainly, in such a case the measure of damages would not be less than the amount of the bonds. Is this changed by the company performing a part of its contract, unless it could be at least shown that such part performance was of some benefit or advantage to the city? And is this not a subject of evidence? There is nothing in the petition to show that this part performance was of any benefit to the city. Suppose the company were suing on these bonds: would it not be a good defense in whole, or part, depending on the evidence, to show that it had failed in whole, or part, to comply with its contract? To the same extent cannot an action be maintained against the company where it has sold the bonds to an innocent purchaser?

7. The next error complained of is, that improper evidence was admitted; this assignment is disposed of by the argument made upon the fourth assignment, namely: none of the evidence is before the court for review.

8. The remaining error complained of by plaintiff in error is, that the jury did not give a proper response to that part of the finding embraced in the words, "How are such damages made up, and from what *data?*" To answer the question, must the jury make an analysis of a general verdict, or must they explain all the mental processes by which they severally reached their conclusions? Courts sometimes give a bad reason for a good judgment. Juries would *generally* do so. If they in each case were required to state how their verdicts were "made up," and their verdicts set aside when any illogical steps in the process were detected, this statute would have a most benign effect in the administration of law and justice. And upon "what *data.*" This is a Latin word, in the plural number, and to find the *data* upon which a verdict rests, would be to find all the facts, and not "a particular fact." The jury are to be governed by the evidence; and to ask them upon what *data* they found their verdict is equivalent

to asking them upon what evidence? The court ought not to have propounded this question to the jury, but as it did so — at the instance of the plaintiff in error — it cannot complain, and the response of the jury was a wise answer to a foolish question.

9. As to what is the measure of the plaintiff's damages in this action — whether the amount of the bonds issued, or the injury which necessarily and proximately results from an admitted breach of the contract by the plaintiff in error, it may be somewhat difficult to say. The petition puts it in the alternative. If this is an entire contract, and the plaintiff in error is compelled to perform all its conditions, or return the consideration it receives, then of course there is no material error in respect to the admission of evidence on the subject of damages, as the jury only found the amount of the bonds given to the railroad company by the city. (*Baldwin v. Bennett,* 4 Cal. 392; *Hunt v. Test,* 8 Ala. 713.) Where it is impossible to estimate the damages, the consideration paid is the measure of damage: *Coffin v. Meigs,* 4 Cal. 363. Suppose that in the case at bar the railway company had complied with the contract in full, and the city had failed, or it had partially complied, and the city had prevented it from complying: can it be doubted that in such a case, in an action by the company against the city, the measure of damages, in the language of the California cases, would be, "the price agreed to be paid," because, from the "nature of the contract," it would not be practicable to estimate the damages? Suppose the railway company had complied with the contract in every particular: what would be *its* damages upon a suit against the city for the breach of the contract? Manifestly the amount of the bonds. Here the city has paid the company in advance. It was to subscribe $75,000 to the capital stock of the company. It has done it. It was to assign that stock to the company, or a person by it named, for a nominal consideration. It has done that. It was then to donate $25,000 to the company for grounds for machine-shops, etc. It

has done that—which is all admitted in the answer of plaintiff in error. The railroad on its part was to build its through-line, *via* Fort Scott, and make Fort Scott the end of a division. This was an entire contract. The city advances the $100,000; the railroad company fails to perform its contract. Cannot the city recover it back? Was not the performance of all the stipulations of its contract a condition precedent to the right of the railroad company to demand the bonds? Having received and converted them without complying with its contract, does not the amount of the bonds furnish the measure of damages in an action by the city? Can the company be allowed to pocket the full consideration for its contract, and perform only in part, and then because it is difficult or impracticable to assess the *real* damages sustained, say in court of justice, that the plaintiff is only entitled to nominal damages? The principle may be further illustrated: If the railroad company had simply built the road, and had not made Fort Scott the end of a division, or erected its machine-shops there, it could not, in an action, compel the city to issue the bonds or recover their value, because the *contract is entire*. It is only where the party *agrees* to receive a part performance, that the other party can recover *pro tanto*, or where the law implies such an agreement. If A. make an absolute purchase of two hundred bushels of corn, at 25 cents per bushel, to be delivered in thirty days, and B., the vendor, delivers 100 bushels in ten days, but delivers no more, B. can recover, after the thirty days expire, for the 100 bushels delivered, because, by A.'s accepting the 100 bushels when he could have refused to accept it, and keeping it when he could have returned it, the law implies an agreement on his part to treat the contract as severable; but this implication arises only when a part performance is accepted where it could be refused, or where the things delivered could be returned. This exception cannot apply to the city. It could not have refused to accept the advantages of this part performance; it could not have returned the advantages derived therefrom to the company. (1 Story on Contracts, §§ 25 to 25*d*; 2 Parsons

31—15 KAS.

on Contracts, 658 to 560.) Is not the converse of this propo-
sition true also? Where the railway company has only per-
formed part of an entire and indivisible contract, but has
succeeded in getting the full consideration for its entire per-
formance, cannot the city recover back the whole considera-
tion?

"A party is always entitled to recover on a breach of
contract such damages as the natural, direct and proximate
result of such breach, and such other damages as may reason-
ably be supposed to have been in the contemplation of both
parties, at the time of the contract." *Johnson v. Mathews*, 5
Kas. 118. This is a general principle. It is to be presumed
that the court so charged the jury in this case. It may be
difficult to tell exactly what particular facts the jury ought
to take into consideration in deciding upon the amount of
damages the plaintiff should recover. The difficulty and
delicacy of the question has nothing to do with *the right* of
the plaintiff to recover, or else we would have a wrong with-
out a remedy. "Where from the nature of the case damages
cannot be estimated with certainty, all the facts, and circum-
stances, reasonably tending to show damages should be placed
before the jury to enable them in the exercise of good sense
and judgment to find such probable estimate as will produce
adequate compensation." *Gilbert v. Kennedy*, 22 Mich. 117;
*Alison v. Chandler*, 11 Mich. 542. The verdict can be sus-
tained under proper evidence and instructions upon the alle-
gations of the petition, upon this theory. The petition,
therefore, states facts sufficient to justify the verdict, and
that is the only question which can be examined upon this
record.

The opinion of the court was delivered by

BREWER, J.: At the March 1874 term of the district court
of Bourbon county, the city of Fort Scott, defendant in error,
obtained a judgment against the plaintiff in error for the sum
of $100,000, for an alleged breach of contract. To reverse
that judgment the Railway Company brings this proceeding

in error. At the outset we are met with an unpleasant controversy of a personal character. It is insisted by counsel for the city, that no valid case made is here, and that we can only consider such questions as arise upon the pleadings and judgment. On the other hand, the counsel for the company moves to strike out certain portions of the certificate of the trial judge to the case made, on the ground that they are surplusage, and that they are "intentionally false, and were fraudulently incorporated," and charges a conspiracy between the counsel for the city and the trial judge to prevent the Railway Company from obtaining a case for review.

The case was tried before a judge *pro tem.*, who on the day of the rendition of the judgment, the 2d of April, gave thirty days in which to make and serve a case. The case was not signed by such judge until the 4th of May. It is insisted that upon the expiration of the term the powers of the judge *pro tem.* ceased, and that he could not thereafter do any act in the suit, not even to the extent of settling and authenticating a case made. The case was signed by the regular district judge on the 1st of May, and it is claimed that a judge has no power to settle and sign a case made except in proceedings and actions regularly had and tried before him. In other words, the claim is, that upon the expiration of the term at which a case is tried, if tried before a judge *pro tem.*, the power to obtain a case made ceases. It may be remarked, that it does not distinctly appear that the term had expired at the time this case was signed by the judge *pro tem.* Nothing in the law prevented the continuance of the March term beyond the 4th of May. There is no positive affirmation in the record that the term had been adjourned. The counsel for the city objected, it is true, to any action of the judge, on the ground that the term had been adjourned; but the judge overruled the objection, and it may be that he so ruled

1. Judge pro tem.; powers and jurisdiction. because the fact was not as asserted, instead of because he deemed the law not to be as claimed. We do not however rest any decision upon this ground, for while there is no positive assertion that the

court was adjourned, it seems probable, from the ruling of the judge upon the objection of the city's counsel, as well as from the opening words of his certificate, that such was the fact. The certificate of the trial judge, although a judge *pro tem.*, and made after the adjournment of the term at which the case is tried, is, if there be no other objection to it, sufficient. That the judge before whom a case is tried, is the proper officer to settle the record of the proceeding upon such trial, is manifest. And the power of a judge to settle and sign a case, although his term of office has expired, and although there be no statutory authority therefor, has been affirmed by courts of the highest authority. *Fellows v. Tait*, 14 Wis. 156; *Davies v. The President of the Village of Menasha*, 20 Wis. 194; *Hale v. Haselton*, 21 Wis. 320. We have a statute bearing upon this question. In § 1, chapter 85 of the laws of 1870, it is provided, that the case made "when so made and presented shall be settled, certified and signed by the judge who tried the cause;" and also, that "in all causes heretofore or hereafter tried, when the term of office of the trial judge shall have expired, or may hereafter expire, before the time fixed for making or settling and signing a case, it shall be his duty to certify, sign or settle the case, in all respects as if his term had not expired." A statute like this is not to be construed in any restricted, technical manner, but liberally, in the ends of justice, that defeated litigants may have a full opportunity for the reëxamination in the supreme court of the questions decided against them below. In *Thurber v. Ryan*, 12 Kas. 453, we held this statute applicable to a case where, before the time for settling and signing a case made, a law took effect detaching the county from one and transferring it to another judicial district, thus giving to the county a new district judge. It may be that it is, strictly speaking, hardly correct to speak of the "term of office" of a *pro tem.* judge. Perhaps he may not technically have a "term of office;" and yet such an expression does no great violence to language. It clearly comes within the spirit and

*Office of pro tem. judge.*

purpose of this statute, that whenever the judge before whom a case is tried shall, before the expiration of the time allowed for settling and signing the case made, have ceased to be judge, he shall nevertheless settle and sign the case made. His judicial life has ended, yet he may and must prepare·for the review of the appellate court the record of the proceedings before him. We think therefore, the certificate of the trial judge must be held good, notwithstanding this objection.

Again, it is insisted that the case made must be disregarded because it was not settled and signed until after the expiration of the time allowed therefor. This claim we think arises from a misapprehension of the statute, a misapprehension evidently shared by counsel on both sides. On the 2d of April an order was made that the railroad company "have thirty days in which to make and serve a case." On the 4th of May the case was settled and signed. This it is true was more than thirty days after time of the order of extension: But that order did not fix the time for settling and signing the case, or direct notice to be given of the time for presenting the case for settlement. It simply extended the time for *making* and· *serving* the case. The making and serving of a case are the acts of the plaintiff in error; the suggestion of amendments, the act of the defendant in error; and the settling and signing of the case, the duty of the judge. Sec. 547 of the civil code (Gen. Stat. 737,) authorizes a party to make a case. Sec. 548 provides that he shall, within three days after the judgment or order is entered, serve such case made upon the opposite party, or his attorney, who may within three days thereafter suggest amendments, and present the same to the party making the case. "The case and amendments shall be submitted to the judge, who shall settle and sign the same; and the case so made shall thereupon be filed with the other papers in the action." Section 549, as amended in 1870, (Laws of 1870, page 168,) gives the court power to extend the time for making and serving a case, and also to direct

*2. Time for setting case. Sec. 548 of code construed.*

notice to be given of the time when the case may be presented for settlement, after it has been made and served, and amendments suggested. Now the extension of the time for making and serving a case, does not take away the time for suggesting amendments. The three days *thereafter*, in which to suggest amendments, still remain. And where there is no order fixing the time for presenting the case for settlement, and only the simple order giving an extension of time for making and serving a case, the case is duly settled and signed, if settled and signed within three days after the time fixed for making and serving a case. It is true, the statute may be read so as to mean that the three days in which to suggest amendments shall be three days after the actual service of the case, and not after the time given in which to serve. Thus, in this case, the case was served on the 21st of April, several days before the expiration of the time granted. Upon such a construction, amendments would have been required by the 24th. But the other construction, that making the three days to commence upon the expiration of *the time given* for making and serving the case, while equally warranted by the language, is more in harmony with the definitions and regularity of judicial proceedings, and therefore to be preferred. A party whose adversary has taken time to make a case, knows exactly when he must be ready with his amendments, and can arrange his business accordingly, while otherwise he must be in suspense waiting the action of his adversary and ready to proceed immediately after such action. We conclude then, that as the case was settled and signed within the three days after the expiration of the time given for making and serving it, it was settled and signed in time.

The certificate having been signed by the proper officer, by one having authority to sign, and within the legal time, we come to the motion of plaintiff in error to strike out a part of the certificate. We give the certificate in full. It is as follows:

"I, JOHN M. GALLOWAY, being a practicing lawyer in the

*3. Suggesting amendments. Three days allowed.*

*4. Certificate of trial judge.*

city of Fort Scott, Kansas, and having held the March Term 1874 of said district court, within and for the county aforesaid, as judge *pro tem.*, duly elected and qualified, because of the sickness and absence of the Hon. M. V. Voss, the regular judge of said district, and as the said judge *pro tem.* having heard and tried the above entitled cause at said March Term 1874, do hereby certify that the above and foregoing case made by defendant was presented to me by Wm. C. Webb,* attorney for the defendant, the M. K. & T. Railway Company, on this 4th day of May 1874, for settling, signing and allowing the same as of record. And at the same time and place appeared H. C. McComas, John E. McKeighan, and William C. Stewart, attorneys for the plaintiff, the city of Fort Scott. And the said attorneys for plaintiff objected to the said case presented being examined, settled, signed or allowed by me, because the time for making, presenting, settling and allowing said case had expired; and because a *pro tem.* judge, after the adjournment of the term of court which he held, has no further power to act as judge, and because the order herein made, by which the time was fixed for making, presenting and allowing said case was a consent order, and could not be altered or extended by the court—which objection was by me overruled and denied, and to which ruling the plaintiff, by its attorneys, duly excepted. And I do hereby refuse to extend the time for making and presenting this case, and. do find, as a matter of fact, at the request of the plaintiff, that the time for making, presenting, settling, and allowing said case has expired, and that no case made was presented to me within the time allowed the defendant by the order in said case made.

"I further certify, that the foregoing case made, together with the amendments suggested by the plaintiff, and submitted to me in writing on the 22d of April 1874, is correct, except that it does not contain all the evidence, and does not contain the charge of the court. It is therefore, ordered and directed that the case as above made and presented, with amendments thereto, be filed with the clerk of said district court aforesaid, and made a part of the record."

[*ALTHOUGH wholly immaterial to any question controverted or decided in this court, it is due to the "truth of (personal) history," to say, that Mr. WEBB was *not* then, or at anytime, *the* attorney or *an* attorney for the M. K. & T. Rly. Co. in this action or proceeding; but in presenting the case-made to the trial judge, for his signature, Mr. W. was merely performing a friendly office for (and at the personal request of) Judge SEARS, the Company's attorney, who was at that time absent.—REPORTER.]

The motion is to strike out that portion commencing with the words, "And at the same time and place," and ending with the words, "and does not contain the charge of the court," and also from the last clause the words, "with amendments thereto." Upon this motion a large amount of testimony has been taken in depositions before a commissioner heretofore appointed by this court. We forbear commenting upon this testimony, for it is conflicting, as well as voluminous, and anything like a fair statement of it would require more space than we can afford to give. And besides, conceding that the charge were proven, as fully and as broadly as it is made, that the facts were exactly as claimed by the plaintiff in error, that the statements objected to were intentionally false, and fraudulently incorporated, and that there was a conspiracy between the counsel for the city and the judge *pro tem.* to prevent the company

5. Certificate of judge to case made, cannot be altered or amended.

from obtaining a case made, still we should be constrained to hold that the motion must be overruled. It involves the reformation of the certificate, and in substance asks this court to make a new certificate. The correction here sought is the *striking out* of a portion; but the principle would be the same if the application were to *add* something. In either case the effect is to set aside the certificate as made, and substitute a new one. It becomes really the certificate of this court, instead of the

When it may or ought to be disregarded.

trial judge's. It may well be, that if a certificate is shown to be intentionally false, and fraudulently prepared, this court should disregard it; but it should be wholly disregarded. The verdict of a jury may be shown to be willfully false to the evidence, and fraudulently prepared; but the court has no power to reform it, by eliminating the false, and adding the true. It must be rejected altogether. The statute we have quoted heretofore provides that the case should be settled and signed by the trial judge. If he has acted corruptly and fraudulently, the whole act of settling and signing, the entire certificate, is worthless. If the corruption is in favor of the plaintiff in error, and to

secure a reversal, ordinarily the rights of the defendant in error will be protected in a new trial. If in favor of the defendant in error, and to prevent a reversal, cases may arise in which it will be the duty of the reviewing court to set aside the judgment, and order a new trial, presuming, on account of such corruption in the preparation of the case, that the plaintiff in error was wronged in the trial, especially when this corruption involves a conspiracy between the judge and the defendant in error. But even in such a case, we should not attempt to make, by addition or subtraction, a correct certificate, but should reject it altogether. For the correction of a certificate involves a determination of what actually took place, of what is true, and what is false. This court, before it could make a correction, must determine not merely that the trial judge acted corruptly, but that his certificate was false in fact. For if the certificate be in fact true, the plaintiff in error has suffered no wrong. And no matter how corrupt and bad the judge may have been, the party has no right to have anything but the truth in the case, or certificate. *K. P. Rly. Co. v. Simpson*, 11 Kas. 494. And upon a motion like this, to inquire into what actually took place in the trial of a case in the district court, a trial which may have been tedious and protracted, and to settle upon affidavits and depositions a bill of exceptions, or case made, is a proceeding not warranted by authority, nor likely to accomplish successfully the intended result. Suppose the judge had refused to sign the certificate prepared, claiming it to be untrue: would this court, by mandamus, compel him to sign it, or hear evidence to show that it was true, or that the judge corruptly refused to sign it? *Shepard v. Peyton*, 12 Kas. 616. Take the case before us: to strike out the portions of the certificate objected to, would leave the case made with a statement that it contained the entire testimony, certified to be correct. With the certificate as it stands, it appears that other testimony was also admitted. Now, conceding the corrupt and fraudulent conspiracy, it does not follow that this particular statement in the certificate is untrue. The case as prepared may

not in fact contain the entire testimony, and it would be wrong to leave it with such a certificate. And how can we determine its truth or falsity, except by a tedious and unsatisfactory inquiry as to what testimony was actually offered and received on the trial? Surely, such a proceeding is unreasonable, and would tend to error and injustice. The motion therefore to strike out must be overruled. The only substantial difference between the record with the certificate as it stands, and with it as sought to be corrected, is, that in the one case it does not appear to contain the entire testimony, and in the other it does. For the record does not purport to contain the charge of the court; and one of the matters presented by plaintiff in error, on the hearing of its motion, is a claim that it could not obtain from the judge his charge.

Upon the case as it stands before us, appear two principal questions, one involving the validity of the original contract

6. Contract between City and Railway Company. Conditions.

between the parties, and the other the measure of damages for the breach of such contract. On the 25th of July 1870, an ordinance was passed by the city council of the city of Fort Scott ordering an election on the 30th of August following, upon the question of subscribing to the stock of the corporation, plaintiff in error, and issuing the bonds of the city in payment therefor. The election was held, and resulted in favor of the subscription. The bonds were issued, and the subscription and bonds accepted by the company. For a breach of the terms of this subscription, was this action brought. The first, fourth, fifth, and eighth sections of this ordinance are the only material ones, and read as follows:

SECTION 1. That a special election be and the same is hereby ordered to be held in the several wards of the city of Fort Scott, on Tuesday the 30th of August 1870, for the purpose of submitting to the qualified electors of said city, the question of subscribing, in the name of the city, and on the conditions hereinafter prescribed, for seventy-five thousand dollars of the capital stock of the Missouri, Kansas & Texas Railway Company, and also the further question of authorizing the mayor and city council of said city, to issue

the bonds of the city in a sum not exceeding twenty-five thousand dollars, for the purpose of procuring the right of way for the road of said company through the corporate limits of the city, and in addition thereto, to purchasing grounds, as hereinafter provided, not exceeding in the aggregate twenty-eight acres, for depots, engine-houses, machine-shops and yard-room, and donating the same to said company.

SEC. 4. If upon a canvass of the votes cast at said election, it shall be found that a majority of such votes are in favor of the stock, and donation, the mayor and city council shall be authorized and required to subscribe, in the name of the city of Fort Scott, for seventy-five thousand dollars of the capital stock of said company, on the following fundamental conditions, to-wit:

*First:* That the said company, their successors or assigns, shall, within six months from the date of the election above provided for, construct or cause to be constructed, and put in practical operation, a line of railway from Sedalia, in Missouri, to the city of Fort Scott, and shall extend the same as soon thereafter as practicable, in a southwesterly direction, to a point on the Missouri, Kansas & Texas Railway, lately known as the Southern Branch of the Union Pacific Railroad, Eastern Division.

*Second:* That said company shall make said line of railway from Sedalia, or from any point to the northwestwardly thereof, to which said company may hereafter extend its road, or cause the same to be made, the great through-line, by way of Fort Scott, to the southwest, and south, through the Indian Territory, to Texas; and no other line of railway shall be constructed by said company, or its successors, from Nevada, in Missouri, south of Fort Scott, through Bourbon or Crawford counties, in Kansas.

*Third:* Said company shall make or cause Fort Scott to be made the end of a division on said line of road, and shall erect engine-houses and machine-shops at or near said point, before doing so at any other point southwest of Sedalia, on the through-line of railroad from Sedalia by way of Fort Scott to the Indian Territory and Texas, as soon as the business of said line shall, in the opinion of said company, render such shops necessary.

SEC. 5. The mayor and city council shall be further authorized and required to issue the bonds of the city in payment for said stock, at par, that is, to the amount of seventy-five thousand dollars. Said bonds shall be issued in sums of not less than one thousand dollars each, shall bear interest at the rate of seven per centum per annum, payable semi-annually in the city of New York, where the principal shall also be payable, shall have interest-coupons attached, shall be payable thirty years after the date thereof, and shall be executed in due form of law.

SEC. 8. It shall also be the duty of the mayor and city council, in case the election hereinbefore provided for shall result in favor of the stock and donation, to proceed forth-

with to confer with the proper officers of said company, or its successors, and ascertain at the earliest possible moment the route selected by said company, or its successors, for the line of their road through the corporate limits of the city, and also the grounds chosen by them for depot and other purposes; and they are hereby authorized and required to proceed, in such manner as may be deemed most conducive to the interests of the city, to purchase so much land as may be necessary for the right of way through said city, and also twenty-five acres exclusive of the right of way, at such point convenient to the city limits, as the officers of said company may select, for depot, engine-houses, machine-shops and yard-room, and they are further authorized to issue bonds of the city, not exceeding twenty-five thousand dollars in amount, for the purpose of raising funds to pay for the same: *Provided however*, That in case the mayor and city council shall be of the opinion that the interest of the city will be better subserved by purchasing eight acres within the city limits, and twenty acres outside the city, at some point to be designated by the proper officers of said company, for machine-shops, engine-houses and yard-room, they shall be authorized and hereby required to do so, and to issue the bonds of the city in payment therefor, as above provided.

Section 10 provided for donating to the company the right of way, and grounds, when purchased. By subsequent arrangement between the city and the company, the twenty-five Breach of conditions. thousand dollars of bonds were issued directly to Damages. the company, in lieu of the purchase by the city of the right of way and grounds. It appears that the company has complied with the first and second conditions of the subscription, but has broken the third, by building engine-houses and machine-shops at Parsons, and none at Fort Scott, and by making Parsons, and not Fort Scott, the end of a division. The petition, after the allegations necessary to show the breach of contract by the company, contains these and only these allegations as to damages:

"And the plaintiff charges, that it has been greatly damaged by reason of the conduct of the defendant in this behalf; that if the defendant had complied with its said agreement, and made the city of Fort Scott the end of a division, on the line of its road, and erected the said engine-houses and

machine-shops at or near said city, the so doing would have greatly increased the business and augmented the population and wealth of the said city, and thereby decreased the rate of taxation necessary to pay the interest on said bonds so issued to the defendant. The plaintiff avers, that the sole consideration of and for the said twenty - five thousand dollars in bonds, was to enable the defendant to purchase grounds for said engine - houses and machine - shops, etc.; and that the defendant received said bonds, negotiated them, and applied the proceeds to other and different purposes, and did not apply the proceeds thereof to the purposes aforesaid."

In reference to the validity of the contract, so far as it involved the condition of locating the machine-shops, etc., at Fort Scott, it is hardly so presented by counsel as to justify us in deciding the question. Counsel for the city ignore it entirely, and assume, virtually, that there is no question of its validity. Counsel for the company do not directly attack its validity, nor discuss the power of the city to attach such a condition to its subscription. We quote the language of the brief. After referring to the act for the organization of cities of the second class, to show that no power is there delegated in reference to such a subscription, or contract, and asserting that the only power given is that by §§ 51, 52, and 53 of ch. 23 of laws of 1868, it says:

"What authority then, did this latter statute confer? Simply to permit the city to subscribe to the capital stock of the railway company, and pay up such subscriptions in its bonds, or loan its credit to such company. No authority was given to enter into speculations in building machine-shops, engine-houses, speculating in real estate, or any such thing. If it had entered into a contract for such subscription, or loan, with the conditions that are attached to the ordinances herein, it is barely possible it could enforce it in case of breach, by a recovery in damages—but only such damages as would bear a *pro rata* proportion between those conditions performed, and those not performed. In other words, that it could only make such a contract, as would itself furnish the measure of damages. It could take the necessary measures to protect itself *in what it paid*, but no further." * * * "For the purpose of this argument, I admit that it may enforce the performance of the conditions upon which the subscription

was made, provided they are legal, and mutually operative. But in case of breach, it can only recover such damages as grow *out of the contract*, and then to be measured *pro tanto.*"

We shall therefore assume that the contract of subscription, with the conditions attached, was valid and binding. It is obvious, that the question of power of a municipality, in this direction, may arise in at least two ways: first, where, without any subscription to the capital stock, a municipality makes a contract with a railroad company for the location by the latter of its engine-houses and machine-shops in consideration of municipal aid; and second, where the location is made as a condition of a subscription to the stock. Chapter 29 of the laws of 1869, amending the sections of the law of 1868 heretofore cited, provides in terms for subscriptions by municipalities "upon such condition or conditions as may be prescribed" by them. So that express statutory authority is given for a subscription upon conditions other than the mere cash or bond payment for the stock.

We pass then to the remaining question as to the measure of damages. As the charge of the court is not in the record, we cannot say what rule was laid down by the court for the admeasurement of the damages, and can only inquire whether the testimony admitted, bearing upon the matter of damages, was properly admitted. While the certificate of the judge shows that the record does not contain all the testimony, yet as the amendment suggested by counsel for the city was, to insert, in lieu of the statement that it contained the entire testimony, the statement that "the foregoing is the *substance* of the testimony taken upon said trial, and submitted to the jury," we feel justified in assuming that we have in the record the main matters of evidence upon which the jury based their estimate of damages. Whether this be so or not, if matters improper for their consideration were submitted to them, we cannot say that such matters did not enter into and form a part of their estimate of damages, and so prejudice the rights of the plaintiff in error. Referring to the record, we find that the court

permitted testimony, over the objection of the defendant, tending to show the changes in the population and in the values of real estate in the city, the number of manufactories, dry-goods stores, etc., the price of fuel, etc., from the year prior to the subscription and until after the building of the machine-shops and engine-houses at Parsons. And so far as population and values are concerned, the inquiry was not directed to the number of hands which would be employed about the shops and engine-houses, nor to the value of shops and houses as taxable property, but to the general changes of population, and the depreciation generally through the city of the value of real estate. It also permitted, over like objection, testimony as to the amount paid monthly by the railroad company to their employés at the machine-shops, at Parsons. It is obvious that this testimony had no bearing on the question of a breach of the contract, but must have been admitted as bearing upon the question of damages. These matters therefore were presented as tending to show how much the city had been damnified by the failure of the company to comply with its contract. In other words, if the city had lost in population since the building of the shops at Parsons, the jury might attribute the loss to that fact, and mulct the company in damages accordingly. If real estate had declined in value, if the number of stores, factories, etc., had decreased, the same fact might be taken as the cause, and the company held responsible therefor. We are clearly of the opinion that this testimony was inadmissible, though we are not so clear as to what, in a case like this, is the proper rule for the measurement of damages. The testimony was inadmissible for two or three reasons. First, it involves a mere speculation. There is no certain connection of cause and effect between the failure to build machine-shops and engine-houses, and the decline in population, or decrease in values. Granted, that the failure may tend to produce the decline and the decrease, yet it is but one of many causes; and who can tell, or by what process can it be determined, how much of the result is due to

7. Speculative damages not allowable.

this cause? A general or local financial depression, or failure of crops, the lack of business energy or tact on the part of the citizens, the jealousy of rival places, or the prejudice of the surrounding population, the superior activity and prosperity of adjacent cities, and many other causes, may all have been actively at work, and the main if not the sole causes of the depreciation. To prove the result, and permit the jury to attribute it wholly to the single cause, would often work the greatest injustice. To present all these phenomena, and ask them to determine the extent to which this single cause has contribued to the result, is to invite the jury to the wildest speculation. It is something beyond the power of human wisdom to determine. Again, this is tantamount to an inquiry into profits, and profits both remote and uncertain. The city seeks to recover, not what it has paid out, nor the value of that which the company agreed to build, nor the amount which it would be entitled to collect in the way of taxes off from such improvements, but rather what profits it would have made out of the shops and engine-houses if they had been built according to contract. For the results in the way of increase of population, values, and business, are really nothing but the profits which might be expected to flow from the performance by the company of its contract. Now, while profits are sometimes a legitimate matter of inquiry in actions for damages on account of breach of contract, yet it is only when such profits are the direct and immediate fruits of the contract. The direct result of the performance of the contract would be, the addition to the taxable property of the city, the value of the improvements made within the city. The indirect result might be the increase of the value of real estate generally through the city. And it was this indirect result, to which the examination of witnesses was directed. Suppose that it were within the power of a city, as it is of a private corporation, to engage in manufacturing, and it had made a contract with an individual to build for it a factory: what, in case of a breach of such contract, would

*Inquiry as to uncertain profits, not allowed.*

be its measure of damages? Could it recover for the enhanced value of the real estate within the city which might be expected to result from the addition of such a manufacturing establishment? Clearly not. Such a result, while it might be termed the profits to flow from the enterprise, is a result too remote and uncertain to become a legitimate matter in the estimate of damages. Yet, wherein does the illustration differ from the case at bar? Again, the theory of the law, in the matter of damages, is compensation. It aims at nothing more. Indeed, it is said by a leading writer on the subject, that "the law in fact aims, not at the satisfaction, but at a division of the loss." Sedgwick on the Measure of Damages, 3d ed., p. 35. It does not intend to so award damages that a plaintiff profits more by his adversary's breach, than he would by his performance of his contract. In matters *ex delicto*, the range of inquiry is wider than in actions. *ex contractu*. Some reasons for this are well stated by Mr. Justice Christiancy, in the case of *Allison v. Graham*, 11 Mich. 552, from whom we quote as follows: "There are some important considerations which tend to limit damages in an action upon contract, which have no application to those purely of tort. Contracts are made only by the mutual consent of the respective parties; and each party, for a consideration, thereby consents that the other shall have certain rights as against him, which he would not otherwise possess. In entering into the contract, the parties are supposed to understand its legal effect, and consequently the limitations which the law, for the sake of certainty, has fixed for the recovery of damages for its breach. If not satisfied with the risk which these rules impose, the parties may decline to enter into the contract, or may fix their own rule of damages when in their nature the amount must be uncertain. * * * Again, in the majority of cases upon contract, there is little difficulty from the nature of the subject in finding a rule by which substantial compensation may be readily estimated; and it is only in those cases where this cannot be done, and where from the nature of the stipula-

tions, or the subject-matter, the actual damages resulting from a breach are more or less uncertain in their nature, or difficult to be shown with accuracy by the evidence, under any definite rule, that there can be any great failure of justice by adhering to such rule as will most nearly approximate the desired result. And it is precisely in these classes of cases that the parties have it in their power to protect themselves against any loss to arise from such uncertainty, by estimating their own damages in the contract itself, and providing for themselves the rules by which the amount shall be measured, in case of a breach; and if they neglect this, they may be presumed to have assented to such damages as may be measured by the rules which the law, for the sake of certainty, has adopted." In Sedgwick on the Measure of Damages, 3d ed., p. 34, the rule is thus stated: "In all cases growing out of the nonperformance of contracts, and in those of infringement of rights, or nonperformance of the duties imposed by the law, in which there is no element of fraud, willful negligence, or malice, the *compensation* recovered in damages consists solely of the *direct pecuniary loss*, which includes, in mere money demands, interest for the detention of the amount claimed, and the costs of the suit brought for the recovery of the demand. No *indirect loss* is accounted for." Now, what

8. What damages may be recovered. what was the direct pecuniary loss of the city, in the case at bar? It paid $100,000 in bonds, and some subsequent interest, for the entire agreements of the company. Does not the amount paid fairly represent the direct pecuniary loss? and if that amount was returned to the city, would she not receive compensation? So that, if it could be ascertained what amount the city paid for this particular part of the company's agreements, and that were returned, would she not receive all to which she was entitled? Would she not be compensated? Wherever therefore, in case of a subscription upon conditions by a city to the capital stock of a railroad company, there has been a failure on the part of the company to comply with one or more of the conditions, and it can be shown by the contract, or *aliunde*, what amount was

Amount paid, with interest. paid as a consideration for the condition or conditions broken, such amount and interest is the proper measure of damages. If in this case the allegation of the petition were sustained by the evidence, and it was shown "that the sole consideration of and for the said twenty-five thousand dollars in bonds was to enable. the defendant to purchase grounds for said engine-houses and machine-shops, etc.," that amount at least, with interest, would be properly recoverable from the company. Or, if there were more than this one consideration for such bonds, and the value of the other could be determined, then the difference would be properly recoverable. Again, where the unperformed condition is the erection within the city of buildings, or other improvements, another measure of damages may be accepted. The city, by the nonperformance of the condition, loses the value

Taxable property. of the improvements for purposes of taxation, and this is a direct pecuniary loss, and one susceptible of determination with reasonable certainty. The average rates of taxation in the past — there being no exceptional causes of temporary excessive taxation — may fairly be accepted as the rate of the future. The value of the improvements being shown, the amount of the annual tax is a simple mathematical calculation. This annual tax may be considered in the nature of an annuity, whose present value is susceptible of exact determination by the ordinary tables. In a case like the present, where the size and value of the contemplated improvements are not fixed by the contract, the law implies that they shall be such as are reasonably suited to the purposes for which they are to be used. We suggest these measures of value as applicable, one or both, to the case at bar, though at least for the latter an amendment would have to be made to the petition. Cases may arise,

9. Entire contracts, not apportionable. perhaps the case at bar (when all the facts are presented) may be found to be such an one, in which the contract is an entirety, and there is in it no means of apportionment; and nothing can be shown *aliunde* to establish an apportionment, nor to show the relative or absolute

values of the conditions performed, and those broken. In such a case, the rule of law, we take to be, that no action can be maintained to recover the consideration, nor upon a *quantum meruit*, until all the conditions are performed; and that in case the consideration be paid in advance, and only part of the conditions are performed, the entire consideration can be recovered. Yet to this conclusion, in any given case, the law reluctantly comes, and only when it is perfectly clear that, by no construction or evidence can there be any apportionment or determination of values. With these suggestions we conclude this opinion, fully aware that there may be difficulties in the further progress of this case which we have not guarded against. We are clear that the testimony was improperly admitted, and therefore the judgment must be reversed. We are satisfied that the rules we have laid down for the measurement of damages in this class of cases are correct; but how far either one of them may be found applicable in the future trial of this case, we cannot now determine, the testimony on the trial already had having been turned in an entirely different direction.

The judgment of the court below will be reversed, and a new trial ordered.

All the Justices concurring.